UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KRISTINE VAN VALKENBERG o/b/o, B.G.

        Plaintiff,

    v.                              **REPORT AND RECOMMENDATION**
                                        **1:08-CV-0959 (DNH/VEB)**

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL SECURITY,

        Defendant,

## I.   Introduction

    Plaintiff Kristine Van Valkenberg on behalf of her son (hereinafter "B.G.") brings

this action pursuant to the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g),

1383(c)(3), seeking review of a final decision of the Commissioner of Social Security

("Commissioner"), denying her application for child's supplemental security income

("SSI").[1]

## II.   Background

    On September 24, 2004, Plaintiff on behalf of B.G., who was then 6 years old,

filed an application for SSI claiming disability since September 7, 2004, because of a

learning disability, an emotional disability, attention impairment, and encopresis[2] (R. at

49-52).[3] The application was denied initially on January 25, 2005 (R. at 33). Plaintiff

filed a request for a hearing on April 29, 2005 (R. at 35).

    On October 4, 2006, B.G., his mother, and his attorney appeared before the ALJ

---

[1] This case was referred to the undersigned for Report and Recommendation, by the Honorable Norman A. Mordue, pursuant 28 U.S.C. § 636(b)(1)(B), by an Order dated September 1, 2009.
[2] Encopresis is the "repeated, generally involuntary passage of feces into inappropriate places" such as in clothing. Stedman's Medical Dictionary (27th ed. 2000), STEDMANS 129810 (WestLaw).
[3] Citations to the underlying administrative record are designated as "R."

(R. at 295-317). The ALJ considered the case *de novo* and, on October 25, 2006, issued a decision finding B.G. was not disabled (R. at 14-31). The ALJ's decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review on June 27, 2008 (R. at 3-6). On September 10, 2008, Plaintiff filed this action disputing the disability determination.

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.[4] Plaintiff submitted a Reply Brief and Defendant submitted a Sur-reply Brief, both of which the Court has also considered.  Finally, Plaintiff has filed a separate motion requesting this case be remanded pursuant to sentence six of 42 U.S.C. Section 405(g).

### III.    Discussion

#### A.  Legal Standard and Scope of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be

---

[4] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings . . . ." General Order No. 18. (N.D.N.Y. Sept. 12, 2003).

deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).   "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

A child is considered disabled under the Act if she or he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. §1382c(a)(3)(C)(i). The ALJ will only conclude the child's impairments are

disabling if he has marked limitations in two domains or an extreme limitation in one

domain. 20 C.F.R. § 416.926a(d).  The Commissioner has established the following

three-step sequential analysis to determine whether a child is disabled. 20 C.F.R. §

416.924. At the first step, if the Commissioner determines the claimant is "doing

substantial gainful activity," the claimant will be found not disabled. 20 C.F.R. §

416.924(a). If the claimant is not engaging in substantial gainful activity, at the second

step the Commissioner will determine whether the claimant has a severe medically

determinable impairment or combination of impairments. 20 C.F.R. § 416.924(a). The

Commissioner will determine at step three whether the claimant's impairment or

combination of impairments "meets, medically equals, or functionally equals the

listings." 20 C.F.R. § 416.924(a); see also 20 C.F.R. § 416.924(d).

Based on the entire record, the Court recommends remand because the ALJ

failed to consider all the relevant probative evidence with respect to B.G.'s ability to

acquire and use information.

    **B.**    **Analysis**

        **1.**    **The Commissioner's Decision**

First, the ALJ found that B.G. had not engaged in substantial gainful activity (R.

at 20). Then, the ALJ found that B.G. had the following severe impairments: attention

deficit hyperactivity disorder ("ADHD"), a learning disability, an adjustment disorder, and

encopresis (R. at 20). However, the ALJ concluded B.G.'s impairments did not meet or

medically equaled a listed impairment, either individually or in combination (R. at 21).

Finally, the ALJ found B.G.'s impairments were not functionally equivalent to the listings (R. at 21-30). Specifically, the ALJ found B.G. had a marked limitation in the domain of attending and completing tasks but less than marked limitations in: acquiring and using information, interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being (R. at 25-30).

## 2.     Plaintiff's Claims

Plaintiff argues that the ALJ (a) should have found B.G.'s impairments met or equaled Listing 112.11 and should have explained his conclusion; (b) did not consider the combination of B.G.'s impairments; (c) should have found B.G. had a marked limitation in acquiring and using information or an extreme limitation in attending and completing tasks; (d) made erroneous inconsistent statements (e); did not consider the cumulative effects of B.G.'s encopresis; (f) did not properly consider the social worker's opinions;  (g) did not properly consider the special education teacher's opinions;  (h) did not properly consider the school psychologist's opinions; and (i) erred in failing to call a medical expert. Plaintiff also requests  that (j) the Court should remand in light of new evidence submitted to the Court under sentence six of 42 U.S.C. Section 405(g). Finally, Plaintiff argues that (k) the ALJ should have developed evidence from a Dr. Green. Plaintiff's Brief, pp. 18-26; Plaintiff's Reply Brief, pp. 1-7; Plaintiff's Motion, Docket No. 14.

### a.     The ALJ Properly Explained That B.G.'s Impairments did not Meet or Equal Listing 112.11 and his Conclusion was Supported by Substantial Evidence

Plaintiff argues that the ALJ should have found that B.G. met the requirements of Listing 112.11 for ADHD. Plaintiff's Brief, pp. 24-25. Plaintiff further argues that the ALJ

failed to explain his conclusion that B.G. did not meet Listing 112.11 for ADHD.

Plaintiff's Brief, p. 24. Defendant argues that the ALJ's conclusion was supported by

substantial evidence. Defendant's Brief, pp. 20-22.

The Supreme Court has explained that a claimant's impairment does not meet a

Listing if it "manifests only some of [the] criteria, no matter how severely." See Sullivan

v. Zebley, 493 U.S. 521, 530 (1990) (citing S.S.R. 83-19, 1983 WL 31248). Listing

112.11 describes the criteria for ADHD as follows:

> Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> A. Medically documented findings of all three of the following:
> 1. Marked inattention; and
> 2. Marked impulsiveness; and
> 3. Marked hyperactivity;
> AND
> B. . . . for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.
>       . . .
> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, . . .; or
> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
> d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1. §§ 112.02(B)(2)(a)-(d), 112.11(A)-(B).

6

In this case, the ALJ concluded that B.G.'s impairments did not meet or medically equal Listing 112.11 because they did not meet the listed criteria (R. at 21). The ALJ reasoned that although B.G. had "some of the [paragraph A] diagnostic symptoms necessary to meet the initial criteria of listing 112.11 . . . [his ADHD] even when combined with all of his other impairments, does not result in sufficient marked limitation of function necessary to satisfy the functional criteria of [paragraph] B" (R. at 21). The ALJ explained that B.G. "may have marked difficulties in maintaining concentration persistence and pace," but he "does not have a marked impairment in age appropriate cognitive/communicative function, a marked impairment in age-appropriate social functioning, or a marked impairment in age-appropriate personal functioning" (R. at 21).

As an initial matter the Court concludes that the ALJ properly explained his conclusion that B.G. did not meet all of the criteria for Listing 112.11. Plaintiff correctly notes that an ALJ must provide a sufficient rationale, not merely a cursory conclusion that a claimant's impairments do not meet a listing. See Hunt v. Astrue, 2008 WL 3836406, at *10 (N.D.N.Y. Aug. 13, 2008) (finding the ALJ "failed to provide a sufficient rationale" where he "cited no medical evidence and provided very little reasoning"). However, in this case the ALJ clearly explained in sufficient detail that he found B.G.'s impairments did not satisfy the diagnostic criteria or the paragraph B criteria for Listing 112.11. See Sullivan v. Zebley, 493 U.S. at 530. Therefore, the Court concludes the ALJ did not fail to properly explain the basis for his conclusion.

Furthermore, the Court concludes that substantial evidence supports the ALJ's conclusion that B.G.'s impairments did not meet or equal Listing 112.11. Most notably, the two medical sources to record their observations of B.G.'s ADHD found symptoms

7

below the marked level required by the listing to satisfy the diagnostic criteria of ADHD.

For example, on examination, consultative State agency psychologist, Brett Hartman,

Psy.D., only noted "restless" motor behavior and "mildly impaired" attention (R. at 153).

Psychiatric nurse practitioner, Hani Khalil, observed that B.G. had limited impulse

control and concentration and that his motor activity was increased but not agitated (R.

at 293). However, neither of these medical records indicated that B.G. had the requisite

medically documented marked inattention, impulsiveness, and hyperactivity. Therefore,

the Court finds the ALJ's conclusion supported by substantial evidence.

### b.  The ALJ Considered B.G.'s Combination of Impairments

Plaintiff argues, that the ALJ "did not explain whether or not he considered the

cumulative and interactive effects of [B.G.'s] impairments [and] [t]here is not one word in

the decision which reflects this." Plaintiff's Brief, p. 19. Defendant replies that this

"argument ignores multiple references and acknowledgements in the decision to the

combination of B.G.'s impairments." Defendant's Brief, p. 13. The Court agrees with

Defendant and finds Plaintiff's argument unavailing.

The regulations require an ALJ to consider the "interactive and cumulative effects

of an impairment." 20 C.F.R. § 416.926a(c). Thus, the ALJ "will look first" at a child's

activities and limitations and "will evaluate the limitations from [a child's] impairments in

any affected domain(s)." 20 C.F.R. § 416.926a(c). The Commissioner has explained

that the "technique of looking first at the child's actual functioning in all activities and

settings and considering all domains that are involved in doing those activities, account

for the interactive and cumulative effects of the child's impairment(s)." Social Security

Ruling 09-1p, 2009 WL 396031, at *3 (S.S.A. 2009).

In this case, the ALJ repeatedly stated that he considered the cumulative and interactive effects of B.G.'s impairments and limitations (R. at 21). The ALJ variously stated that: B.G.'s "impairments or combination of impairments" did not meet or medically equal a listed impairment; B.G.'s "impairment or combination of impairments" did not functionally equal the listings; the ALJ had "considered all symptoms"; and B.G.'s ADHD "even when combined with all of his other impairments" did not sufficiently limit B.G. so as to meet the criteria of Listing 112.11 (R. at 21). The ALJ also analysed B.G.'s functioning across all the domains, as described in SSR 09-1p. (R. at 21-30). Based upon the ALJ's decision, the Court concludes that the ALJ considered the combined effects of B.G.'s impairments.

### c. The ALJ Erred in Assessing B.G.'s Functional Equivalence

Plaintiff argues that the ALJ should have found that B.G. had either a marked limitation in the domain of acquiring and using information or an extreme limitation instead of only a marked limitation in the domain of attending and completing tasks. Plaintiff's Brief, pp. 19, 20-21, 25. Defendant argues that the ALJ's conclusions were supported by substantial evidence. Defendant's Brief, p. 10.

An ALJ determines functional equivalence by evaluating a claimant child's functioning in six broad domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi). In each domain, the ALJ will rate the child's degree of limitation as none, less than marked, marked, or extreme. See 20 C.F.R. §§

9

416.926a(d)-(e). The ALJ will conclude the child's impairments are disabling if he has marked limitations in two domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a(d). A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities" in a particular domain. 20 C.F.R. § 416.926a(e)(2)(i). The regulations explain that a marked limitation is "the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id. An extreme limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is "the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id.

### i. The ALJ Failed to Acknowledge Critical Evidence in the Domain of Acquiring and Using Information

The domain of acquiring and using information considers a child's ability to learn, think about, and use information. 20 C.F.R. § 416.926a(g); Social Security Ruling 09-3p, 2009 WL 396025, at *2 (S.S.A. 2009) (hereinafter SSR 09-3p). The regulations explain that "[l]earning and thinking begin at birth" and " [u]sing the concepts and symbols [children] have acquired through play and learning experience, [they] should be able to learn to read, write, do arithmetic, and understand and use new information." 20 C.F.R. § 416.926a(g)(1)(i). Learning, the regulations explain, "involves being able to perceive relationships, reason, and make logical choices." 20 C.F.R. § 416.926a(g)(1)(ii).

In this case, the ALJ found that "[a]lthough the claimant has had some significant difficulties with learning, with the assistance of his current special education plan, the

claimant has made great strides in age-appropriate mathematics, reading, written language, and verbal language" (R. at 25). The ALJ characterized B.G.'s reading as an area of "relative weakness" (R. at 25). In reaching this conclusion, the ALJ explicitly considered intelligence testing conducted by school psychologist, Dr. Hayden Hartmann in May 2006, the opinions of B.G.'s first grade special education teacher, Ms. Schauman from October 2004, the opinions of examining State agency psychologist, Dr. Brett Hartman from January 2005, and the opinions of reviewing State agency physician and psychologist, Dr. Deborah Bostic, M.D. and Dr. Teena Guenther, Ph.D., also from January 2005 (R. at 25). The ALJ then concluded that B.G. had a less than marked limitation in the domain of acquiring and using information (R. at 25). Although the ALJ referred to all of these opinions, as discussed more fully below, he failed to acknowledge critically low standardized test scores and the larger pattern in the record indicating that B.G.'s ability to learn was seriously compromised.

After carefully reviewing the evidence of record,[5] the Court concludes that the ALJ's analysis of B.G.'s ability to acquire and use information is flawed because he failed to acknowledge or explain his implicit rejection of a substantial quantity of evidence probative to this domain. Courts the Second Circuit have repeatedly "remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence." Lopez v. Sec'y of Dept. of Health & Human Servs., 728 F.2d 148, 150-51 (2d Cir. 1984); see Kuleszo v. Barnhart, 232 F.Supp.2d 44, 57 (W.D.N.Y. 2002) (finding error where the ALJ failed to acknowledge or explain the implicit rejection of

---

[5] The Court notes that a substantial amount of evidence, including extensive neuropsychological testing, was submitted to the Appeals Council after the ALJ completed his opinion and therefore was not available for his review (R. at 259-94). The Court has properly considered this evidence as part of the record. See Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

relevant testimony from independent witnesses); <u>Pagan ex rel. Pagan v. Chater</u>, 923 F. Supp 547, 554-56 (S.D.N.Y. 1996) (finding that the ALJ erred with respect to the treating physician's opinions because "[a]lthough the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony," it was error for the ALJ to fail to even acknowledge relevant evidence from the treating physician or to explain its implicit rejection) (<u>citing</u> <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir.1984); <u>Fiorello v. Heckler</u>, 725 F.2d 174, 175-76 (2d Cir.1983); <u>Smith v. Bowen</u>, 687 F. Supp. 902, 904 (S.D.N.Y.1988)); <u>Rivera v. Sullivan</u>, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991) ("[A]n ALJ's failure to acknowledge relevant evidence or explain its implicit rejection is plain error) (<u>quoting</u> <u>Ceballos v. Bowen</u>, 649 F. Supp. 693, 702 (S.D.N.Y. 1986); <u>citing</u> <u>Valente</u>, 733 F.2d at 1045). In this case, the ALJ failed to acknowledge evidence that B.G. was essentially illiterate despite years of school and special education services and interventions.

Evidence of B.G.'s ability to read is especially important because the regulations clearly indicate that reading and writing are crucial to a school-aged child's ability to acquire and use information. 20 C.F.R. § 416.926a(g)(2)(iv) (explaining that school-age children "should be able to learn to read, write, and do math, and discuss history and science" and "use these skills in academic situations to demonstrate" learning, such as reading about various subjects and producing written projects);  SSR 09-3p, 2009 WL 396025, at *2 (describing an example of a limitation as "not reading, writing, or doing arithmetic at appropriate grade level" ); <u>see also</u> <u>McClain v. Barnhart</u>, 299 F.Supp.2d 309, 315 (S.D.N.Y. 2004) (<u>citing</u> <u>Quinones v. Chater</u>, 117 F.3d 29, 31-32, 36 (2d Cir. 1997)) (explaining that "a twelve-year old child could have a marked or extreme

12

limitation in the domain of acquiring and using information if he had a serious learning disability which had prevented him from learning to read and write even though he was of normal intelligence and had good verbal communication skills").

In this case, the evidence shows that because of the combination of B.G.'s learning disabilities, motor delays, attention deficits, encopresis, and social, emotional and behavioral problems, he struggled to learn, especially to read and write. For example, the record shows that B.G.'s learning disability emerged early and he repeated kindergarten (R. at 135). By the end of his second year of kindergarten, B.G. was assessed for and received an individualized educational plan ("IEP") (R. at 132-49). Initial testing at the time placed B.G. in the average range of intelligence, but he performed poorly on tests of processing speed and working memory (R. at 122). On age-appropriate portions of the Wechsler Individual Achievement Test II ("WIAT-II") B.G. scored more than one standard deviation below the mean in word reading, spelling, and almost two below in listening comprehension  (R. at 117). The test administrator opined that "[B.G.]'s academic skills, his ability to apply those skills and his fluency with academic tasks are . . . below his age and grade peers in early Reading skills, early Spelling skills and Listening Comprehension skills" (R. at 119-20). A school psychologist assessing the results indicated that these scores were enough below B.G.'s predicted performance that they were indicative of learning disabilities in those areas (R. at 123). On the Test of Early Reading Ability ("TERA-III"), B.G. performed in the fourth or fifth percentile on three out of four subtests (R. at 127). In assessing the TERA-III scores, school psychologist, Dr. Hartmann explained, that although B.G. demonstrated age appropriate knowledge of the alphabet,

13

> [B.G.'s] ability to look at images of written matter and identify the ways we go about reading was profoundly limited. For example, he could not identify cursive writing on a page, tell where to start and stop reading on a picture of a storybook page, or tell that a word was written upside down. [B.G.]'s ability to absorb meaning from reading materials was also lower than what would be expected for a child his age. For example, he could not guess the names of familiar storybooks from looking at the pictures, identify a picture of a menu, or a school crossing sign.

(R. at 127). Dr. Hartmann opined that B.G. would need additional support in reading and math and noted that his "[l]imited processing speed would affect [B.G.]'s ability to learn material both quickly and accurately" (R. at 128). B.G.'s classroom teacher echoed Dr. Hartmann's assessment, reporting "that although this [was] the end of [B.G.'s] second year in kindergarten his level of functioning [was] low" (R. at 135). Report cards from the end of his second kindergarten year showed that B.G. was not correctly identifying all the letters of the alphabet in either upper or lower case print, and could only indentify corresponding sounds for half the letters (R. at 232-33, 235).

In addition to his learning disabilities, observation, testing and assessment at the end of B.G.'s second kindergarten year showed he also struggled with motor skills, attention and concentration, toileting, and social interaction with peers (R. at 135-37). For example, the consultant teacher observed that B.G. "exhibits low fine motor skills and a persistent lack of handedness. He often needs tasks broken down in to 2 or 3 'sessions' to get to completion" (R. at 135). On standardized test of visual-motor integration, B.G. scored more than two standard deviations below the mean in visual motor integration and in motor coordination (R. at 137, 143).[6] With respect to attention, the consultant teacher noted "he has a difficult time following directions in the

---

[6] The Court notes that on the same test about two years later B.G. was scoring in the average range for visual motor integration, but still scored in the low range for fine motor skills (R. at 225-26).

classroom. [H]e is unable to complete any task in the classroom independently" (R. at 135). Encopresis was a frequent problem according to the school nurse, Suellen Elmendorf, R.N.  Nurse Elmendorf noted that in the period of approximately one month, B.G. visited her office twelve times for encopresis and enuresis and during cleaning and changing she noted that B.G. had trouble with balance and difficulty unbuttoning or unsnapping his pants (R. at 137).[7] Additionally, B.G.'s classroom teacher reported that "[B.G.] is quite physical with his peers but seems to be liked" (R. at 136).

As a result of the combination of B.G.'s impairments, his Individualized Education Plan ("IEP") for the first grade provided him with twenty-five hours a week of consultant teacher services from a special educator and twenty-five hours a week with a teaching assistant, both in an integrated classroom (R. at 133-34). B.G. would also receive counseling one hour a week, occupational therapy thirty minutes a month, skilled nursing services fifteen minutes a day, and speech and language therapy one hour a week (R. at 133). B.G.'s IEP specified that he was to receive preferential seating, access to a teaching assistant during academics, a modified curriculum, refocusing and redirection, assistance attending to all classroom activities, extra time for processing and checking for understanding (R. at 134). The IEP explained that B.G.'s disabilities affected "his ability to process information quickly and accurately, hold information in immediate awareness while manipulating it at the same time, acquir[e] new information at a rate and pace equal to peers, . . . follow directions, [stay] on task, [deficits in] auditory short term memory (ability to retrieve words and information), and morphology

---

[7] The record also shows that B.G.'s mother repeatedly discussed his encopresis with his pediatrician and other doctors, reporting that at times B.G. soiled himself on a daily basis (R. at 102, 105-06, 167, 169-70, 257).

and syntax (word structure, rules of grammar) . . . impact[ed] performance in reading, math and writing tasks" (R. at 135).

Despite the supports provided in this IEP, B.G.'s difficulties continued in the first and second grades. In first grade, although his teacher's comments were generally positive, B.G.'s grades reflect that he was still struggling to learn to read and write (R. at 231). His first grade marks also indicate that B.G. only inconsistently worked and played well with his peers, followed classroom and school rules, or listened attentively (R. at 231). Early second grade report cards show that B.G. was below state standards in reading, writing and listening (R. at 234).

Additional testing in 2006, the spring of second grade for B.G., showed he was performing at even lower levels than previously documented (R. at 192-227). Critically, a WIAT-II administered on May 24, 2006, "revealed an Extremely Low Reading Standard Score of 67" on the reading composite (R. at 206). B.G. scored 67 on the word reading subtest and 64 on the reading comprehension subtest (R. at 206).[8] B.G.'s scores on both the reading composite and the subtests were more than two standard deviations below the mean.

Evaluation also showed that B.G. continued to have distinct deficits in writing, caused in part by his poor fine motor control (R. at 143, 197, 225-27). To assist him with writing and fine motor skills, B.G. was given a "pencil grip," a "slant board," and various exercises in occupational therapy (R. at 144, 148-49, 197, 203-04). In third grade, B.G.'s IEP included goals for successfully manipulating zippers and buttons and tying

---

[8] The Court takes notice that the WIAT-II has a mean score of 100 and a standard deviation of 15. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00D(6)(c) (explaining that the Wechsler series tests have a mean of 100 and a standard deviation of 15); Brown ex rel. T.H. v. Astrue, 2009 WL 2923062, at *2 (E.D.Mo. Sept. 8, 2009) (explaining that the WIAT-II has "a standard deviation of 15 and a mean of 100").

his shoes (R. at 204). Despite these interventions, testing in the fall of 2006 showed B.G. was writing seven to nine words per minute, or "much slower than the typical [second] grade speed of 24-35 letters per minute" and he continued to struggle to write legibly (R. at 226). Occupational therapist, Michele Darling, opined that B.G. "continue[d] to have poor handwriting and fine motor skills that impact his ability to produce readable, written work independently in the classroom" (R. at 227).

Evaluation further showed B.G. was hampered by continued toileting problems, emotional and social problems, atypical behaviors, poor memory and processing speed, and attention deficits. Nurse Elmendorf documented continued toileting issues that were being "manag[ed] in the classroom with frequent trips to the bathroom" (R. at 208). School psychologist, Dr. Hartmann, assessed B.G. again and described some of B.G.'s problems as follows:

> [B.G.] demonstrates a serious impairment of his reality testing abilities, tending to misperceive events and to form mistaken impressions of people and what their actions signify. This behavioral feature is likely to result in a frequent failure to anticipate the consequences of his actions and to misconstrue the boundaries of appropriate behavior. . . [H]e demonstrates a serious impairment in his ability to think logically and coherently. Specifically in this regard, he is much less capable than most people of this age of coming to reasonable conclusions about relationships between events and of maintaining a connected flow of associations in which ideas follow each other in a comprehensible manner.

(R. at 216). In addition, Dr. Hartmann characterized B.G.'s "emotional well being" as "of major concern," explaining that a group of psychological deficits left B.G. in "an emotionally fragile condition that manifest[ed] in inappropriate types of behavior or feelings" and stymied his ability to form interpersonal relationships (R. at 216-17). Special education teacher, Gale VanBaaren observed that B.G. made friends but liked

17

to goad other children and he needed supervision to interact positively with his peers (R. at 197). Also, B.G. sporadically manifested atypical or distracting behaviors, such as making noises and whistling during testing (R. at 213), making silly noises in groups, (R. at 202) chewing his clothing, and having difficulty when he was not chewing something (R. at 152, 202). However, Ms. VanBaaren noted that she had not observed B.G. sucking his clothing or having daily toileting accidents in the spring of 2006 (R. at 229). With respect to B.G.'s processing speed and working memory, testing continued to indicate these were areas of weakness (R. at 195, 214). Similarly, B.G. continued to need support to maintain attention and learn, requiring "a lot of one-on-one assistance," minimal distractions for test-taking, refocusing and redirection supports, preferential seating, and additional time to complete tasks (R. at 193-94). See (R. 133-34) (assigning B.G. a personal teaching assistant for twenty-five hours a week); (R. at 197-98) (placing B.G. in a special behavior management class with only ten students and four adults to provide the intensive support "required to address acute social and behavioral difficulties, attending to task, and low frustration tolerance which interfere with his ability to learn"); (R. at 230) (describing the learning B.G. was able to achieve as the result of "intense support of an adult in the room to have him remain focused and on task).

Based on his second round of testing and assessment, a new IEP for the end of second grade and all of third grade placed B.G. in a special class instead of an integrated setting (R. at 178, 184-85, 192, 198-99). In addition, the 2005-2006 and 2006-2007 IEPs granted B.G. behavioral intervention services one hour a day, counseling thirty minutes a week, occupational therapy thirty minutes a week, and a

teaching assistant one hour a day (R. at 178-79, 192-93). The Committee on Special

Education noted that B.G. was progressing within the confines of his program and

summarized his condition as follows:

> Recommend classification as a student with an Emotional disturbance
> with a condition exhibiting an inability to learn that cannot be explained by
> intellectual, sensory, or health factors; an inability to build or maintain
> satisfactory interpersonal relationships with peers/teachers; inappropriate
> types of behavior or feelings under normal circumstances that manifest in
> constricted emotions that impact ability to initiate and maintain social
> relationships, poor self image, confusion of reality and fantasy and an
> impairment of ability to think logically and coherently that impact
> acquisition of academic skills of reading comprehension, word reading,
> decoding numerical operations, and comprehensive written language

(R. at 198).

In the fall of 2006, B.G.'s doctors referred him for extensive neuropsychological

testing which included the Kaufman Test of Educational Achievement, Second Edition

and the Wide Range Achievement Test, Fourth Edition (R. at 283). On both additional

achievement tests B.G. also scored more than two standard deviations below the mean

on the reading composite (R. at 283). To put it another way, at the beginning of third

grade, having repeated kindergarten, B.G.'s sentence comprehension score was below

the score expected of child entering kindergarten and his word reading score was

equivalent to the score expected of a kindergartener in the fourth month (R. at 283). In

light of these findings, neuropsychologist, Dr. Simone Collymore diagnosed B.G. with a

"severe reading disorder" (R. at 260) and "developmental dyslexia" (R. at 270). Dr.

Collymore's blunt assessment was that B.G. was "essentially unable to read" (R. at

263). As B.G.'s Mom testified, although B.G. was "technically in third grade" he was

"educationally [in] Kindergarten" (R. at 302).

19

Despite a record replete with evidence such as the above describes, the ALJ's decision appears to ignore the very real possibility that B.G. impairments seriously interfere with his ability to initiate, sustain, and complete the activities required for learning. The ALJ's failure to, at a minimum, explain his apparent rejection of this probative evidence requires remand. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (citing Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir.1983)) ("[While] every conflict in a record [need not] be reconciled by the ALJ . . . the crucial factors in any determination must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence.").

Most importantly, the ALJ failed to discuss three separate achievement tests on which B.G.'s reading scores were in the first or second percentile, which is more than two standard deviations below the mean (R. at 194, 206, 283). Johnson v. Astrue, 563 F.Supp.2d 444, 458 (S.D.N.Y. 2008) (citing J.L. Devore & K.N. Berk, Modern Mathematical Statistics with Applications 787 (2007)) ("The percentage of a group that scores two or more standard deviations below the mean in normally distributed data (which is the sort of data we would expect on a standardized test) represents only 2.3% of the population."). The regulations state that the ALJ "will find that [the claimant has] a 'marked' limitation" when a claimant child has "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [the claimant's] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(iii). Thus, B.G.'s achievement tests scores may satisfy the regulatory definition of a marked limitation. See 20 C.F.R. §

416.926a(e)(2)(iii).[9] Even though the regulations clearly explain that test scores two standard deviations below the mean are consistent with a marked limitation, the ALJ did not reconcile B.G.'s relevant scores with his conclusion that B.G. had a less than marked limitation in acquiring and using information and was making "great strides in age-appropriate . . . reading" (R. at 25).

The Court recognizes that an ALJ need not mention every piece of evidence presented when "the evidence of record permits [the Court] to glean the rationale of an ALJ's decision." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983). Indeed, the Court recognizes that the ALJ mentioned several doctors' opinions, a first grade teacher's opinion, and early IQ scores (R. at 25). However, the ALJ failed to acknowledge probative evidence contrary to his conclusion. The evidence ignored by the ALJ reveals that B.G. had significant problems learning, writing, and especially reading. The ALJ's characterization of B.G.'s reading as merely a "relative weakness" is so incongruous with the evidence of record that it is clear to the Court that the ALJ's failure to "acknowledge relevant evidence or explain its implicit rejection" requires

---

[9] Although it is likely, it is not entirely clear in this case that B.G. has a marked limitation to acquiring and using information. As the regulations explain, an ALJ "will not rely on any test score alone . . . [because] [n]o single piece of information taken in isolation can establish whether you have a "marked" or an "extreme" limitation in a domain." 20 C.F.R. § 416.926a(e)(4)(i). In this case, B.G.'s scores on the dozens of standardized tests he took varied from test to test and over time. For example, on February 4, 2005, B.G. achieved a reading composite of 73 (fourth percentile) on the WIAT-II (R. at 182), but on March 4, 2005 he scored a 76 (fifth percentile) on the same test (R. at 182), and on May 24, 2006 he scored a 67 (first percentile) on the same test (R. at 194, 206). Furthermore, the record contains approximately twenty standardized tests that were reported by neuropsychologist, Dr. Simone Collymore, after the ALJ wrote his decision, which also show B.G.'s performance ranging from average to severely impaired levels (R. at 262-86). Thus, the evidence in this case does not conclusively show B.G. had a marked level of impairment, but it does require the ALJ to acknowledge the relevant standardized test evidence.

remand in this case. <u>Rivera</u>, 771 F. Supp. at 1354.  Thus, on remand, the ALJ must
consider all evidence in reconsidering this domain.

### ii. The ALJ Must Necessarily Reconsider the Domain of Attending and Completing Tasks

The domain of attending and completing tasks considers a child's ability to focus
and maintain attention; to begin, carry through, and complete activities or tasks; to
perform tasks at an appropriate pace; and change tasks. 20 C.F.R. § 416.926a(h);
Social Security Ruling 09-4p, 2009 WL 396033, at *2 (S.S.A. 2009) (hereinafter SSR
09-4p).

In this case, the ALJ found that B.G. had a "marked limitation in attending and
completing tasks" (R. at 26). In reaching this conclusion, the ALJ relied primarily upon
B.G.'s first grade special education teacher, Ms. Schauman (R. at 26). The ALJ
considered Dr. Brett Hartman's diagnosis of ADHD and his opinion that B.G. has only a
mild impairment in attention and concentration, but believed that Ms. Schauman's report
and the overall record was consistent with "a more serious problem than Dr. Brett
Hartman's onetime evaluation revealed" (R. at 26). The ALJ also considered whether
B.G.'s limitations rose to the level of extreme, but concluded "[b]ecause the claimant is
still able to function in a partially integrated setting, and perform some tasks
independently, I find that the evidence does not support a finding of an extreme
limitation in this domain, but I do find that the evidence supports a finding of marked
limitation in attending and completing tasks" (R. at 26).

As an initial matter, the Court notes that B.G. was not able to sustain his
functioning in a partially integrated setting. To the contrary, the evidence shows that

B.G. required a special class and "a lot of one-on-one assistance" to stay on task (R. at 133-34, 193-94, 197-98). However, because the ALJ will have to reconsider the evidence of record, particularly B.G.'s standardized test scores and the evidence of the modifications and supportive settings he required to function, the ALJ will necessarily have to reconsider B.G.'s functioning in this domain.

### b.  The ALJ's Typographical Error is Harmless

As part of her functional equivalence argument, Plaintiff also objects to one of the ALJ's findings, which she argues is inconsistent with the ALJ's outcome. Plaintiff's Brief, p. 19. Under the ALJ's discussion of the domain of attending and completing tasks, the ALJ stated "[t]he claimant's most serious limitations are in acquiring and using information" (R. at 26). Plaintiff objects that on one hand the ALJ found B.G.'s most serious limitation was in acquiring and using information, but on the other hand found B.G. had only a "less than marked" limitation in acquiring and using information but a "marked limitation" in the domain of attending and completing tasks (R. at 25-26). Plaintiff points out that B.G.'s ability to acquire and use information cannot be both his most serious limitation and also less limited than his ability to attend and complete tasks.  Plaintiff's Brief, p. 19. Defendant argues that "[i]t is readily apparent that the statement . . . [was] a typographical error" and that the ALJ "meant to say" that B.G.'s most serious limitations were in the domain of attending and completing tasks. Defendant's Brief, p. 11.

Courts have found typographical errors to be harmless if it is obvious from the opinion as a whole that the error is typographical and not substantive. See Brewerton v. Barnhart, 235 F.R.D. 574, 578 (W.D.N.Y. 2006) (finding only a typographical error

where an ALJ stated an "opinion is given significant weight" but from the decision as a whole it was clear the "opinion was *not* given significant weight"); Lopez v. Comm'r of Soc. Sec., 2009 WL 2922311, at *12 n.37 (E.D.N.Y. Sept. 8, 2009) (finding the ALJ's reliance on a non-existent Medical Vocational Rule a "a typographical mistake and not a substantive error" where there was no ambiguity considering the ALJ's decision as a whole); Brown ex rel S.W. v. Astrue, 2008 WL 3200246, at *13 n.19 (N.D.N.Y. Aug. 5, 2008) (finding the ALJ's reference to the wrong exhibit number to be a "typographical error"). Having reviewed the entire decision, the Court concludes that the ALJ's statement that B.G.'s most serious limitation was in acquiring and using information was a typographical error. This is clear because the ALJ carefully separated out his discussion of B.G.'s functioning in each domain and this reference is otherwise out of place (R. at 24-30). More importantly, referencing B.G.'s ability to acquire and use information does not logically fit in the context because the sentences before and after refer to B.G.'s limitations in attending and completing tasks (R. at 26).

### c. The ALJ Properly Considered the Cumulative Effects of B.G.'s Encopresis

Plaintiff further argues that the ALJ failed to consider the cumulative effects of B.G.'s incontinence "in determining the extent of impairment in the domain of caring for oneself, and also in the domain of health and well being." Plaintiff's Brief, p. 20. Defendant argues that the ALJ considered B.G.'s incontinence "when finding that B.G. had less-than-marked limitations in both domains." Defendant's Brief, p. 14.

In determining that B.G. had a less than marked limitation in caring for himself, the ALJ primarily considered B.G.'s encopresis (R. at 29). Plaintiff has not alleged, nor

has the Court identified in the record, any other limitation that B.G. had in the domain of caring for himself. The ALJ's decision reflects this in his decision wherein he discusses the various things B.G. can do to care for himself, such as dressing, eating, taking the bus, and even beginning to help his mother by vacuuming (R. at 29). With respect to B.G.'s health and physical well-being, the ALJ again considered B.G.'s encopresis, but nonetheless concluded that B.G. was "generally in good physical health" (R. at 30). Notably, B.G.'s mother never alleged any impairments in B.G.'s physical health, and reported he was physically active, including swimming and playing on the family's trampoline (R. at 71, 303).Based on the foregoing, the Court concludes that ALJ appropriately considered B.G.'s toileting problems in determining the extent of his limitation in the domains of caring for himself and health and physical well-being.

### d.  The ALJ Properly Considered Opinions from Social Worker, Raymond Tartikoff

Plaintiff argues that the ALJ improperly rejected the opinions of social worker, Raymond Tartikoff. Plaintiff's Brief, p. 23. Defendant argues that the ALJ properly considered the opinion of Mr. Tartikoff. Defendant's Brief, pp. 17-19.

The record indicates that Mr. Tartikoff treated B.G. in therapy sessions since some time in 2005 (R. at 300). Mr. Tartikoff completed a functional assessment form on September 20, 2006 in which he rated B.G.'s limitations as either marked or extreme in all six domains (R. at 253-56). Mr. Tartikoff also briefly noted that B.G. had slurred speech, was unaware of odor or discomfort related to his encopresis, had impaired motor skills, and numerous symptoms of separation anxiety from his mother (R. at 253, 256). The ALJ considered Mr. Tartikoff's report as follows:

25

> Unfortunately, this report is both poorly supported by the objective clinical and laboratory findings and is inconsistent with all other evidence in the record. . . . He [has] provided no rational justification for these levels of limitation, and some of them appear laughably inconsistent with the facts. For example, the report lists the claimant as having an extreme limitation in health and physical well-being despite the fact that the claimant is described even by his mother as being in generally good physical health with the exception of some digestive problems.

(R. at 24). Therefore, the ALJ gave Mr. Tartikoff's opinions "little or no weight" with respect to B.G.'s functioning (R. at 24). The ALJ gave "some consideration" to Mr. Tartikoff's handwritten notes, but noted that even those observations were "out of proportion" with the other evidence of record (R. at 24).

The Court finds the ALJ's analysis is proper and supported by the record. Although social workers are not "acceptable medical sources," their opinions are nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects." Social Security Ruling 06-03p, 2006 WL 2329939, at *3 (S.S.A.) (hereinafter SSR 06-03p); see 20 C.F.R. §§ 416.913(a), (d). In considering such opinions, the ALJ may apply the factors in 20 C.F.R. § 416.927(d)(1)-(6), which are "basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources.'" SSR 06-03p, 2006 WL 2329939, at *4. Those factors are: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency of the opinion with the record, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the ALJ. 20 C.F.R. § 416.927(d)(1)-(6). Here, the ALJ assessed the supportability and consistency of Mr. Tartikoff's opinions and found them lacking. Substantial evidence of record supports the

ALJ's analysis in this respect. Most notably, Mr. Tartikoff offered no basis or explanation for the degree of limitation indicated in his opinions (R. at 253-56). Furthermore, no other opinions or other evidence of record indicates that B.G. was so severely limited across all domains. Given the lack of supporting evidence and the ALJ's reasonable analysis of Mr. Tartikoff's opinion, the Court concludes that Plaintiff's argument must fail. See Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995) (explaining that "the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him").

### e. The ALJ Properly Considered Opinions from Special Education Teacher, Heather Schauman

Plaintiff further argues that the ALJ erred in rejecting Ms. Shauman's opinions because he "failed to follow" SSR 06-03p. Plaintiff's Brief, p. 23-24. SSR 06-3p requires an ALJ to consider the opinions of non-medical sources, such as teachers, using the factors from 20 C.F.R. sections 404.1527(d) and 416.927(d). SSR 06-03p, 2006 WL 2329939, at *3-4. Those factors include: how long the source has known the individual and how frequently they see the individual; how consistent the opinion is with the other evidence; the degree of relevant evidence the source presents supporting the opinion; how well the source explains the opinion; whether the source has a specialty or expertise; and any other factors that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5. Defendant argues that the ALJ applied the requirements of SSR 06-3p and properly assessed Ms. Schauman's opinions. Defendant's Brief, pp. 19-20.

On October 21, 2004, B.G.'s first grade special education teacher, Ms.
Schauman, completed a teacher questionnaire provided by the State disability agency
(R. 109-16). Ms. Schauman assessed activities under each of the six functional
domains and rated B.G.'s functioning on a scale from one, corresponding to no
problem, to five, corresponding to a very serious problem (R. at 109-16). For example,
in the domain of acquiring and using information, Ms. Schauman was asked to rate ten
activities, including "[c]omprehending oral instructions" (R. at 110). To rate B.G.'s
functioning in "[c]omprehending oral instructions," Ms. Schauman circled the numeral
three, corresponding to "[a]n obvious problem" (R. at 110). Ms. Schauman also wrote
comments on B.G.'s functioning in each domain (R. at 110-14).

The ALJ considered Ms. Schauman's opinions and gave "great weight to the
observations recounted in this report and the opinion regarding the claimant's relative
strengths and weaknesses shown in the checkbox portions of this form" (R. at 23).
However, the ALJ carefully explained that he did not give great weight "to the particular
numbers circled on this form indicating levels of limitation" because if "taken literally in
accordance with the definitions used in the Social Security regulations, they would
represent levels of limitations completely inconsistent with the objective clinical and
laboratory findings" (R. at 23). For example, the ALJ explained that Ms. Schauman
rated B.G.'s ability to move his body from one place to another as a four, or a serious
problem, but the ALJ noted B.G.'s own testimony revealed that he was very active and
enjoyed biking, swimming, and sports (R. at 23). The ALJ observed: "If we except [sic]
that this is what the claimant's special education teacher considers a 'serious problem'
moving his body from one place to another, this gives us some idea as to the level of

28

age-appropriate function that she considers 'a serious problem'" (R. at 23). Therefore, the ALJ gave "great weight to [her overall] opinion, but . . . generally relied on the numbers indicated only for relative comparison to one another rather than as absolute numbers indicating the claimant's function on an independent objective scale" (R. at 23-24). Thus, the ALJ reinterpreted the specific numbers that Ms. Schauman circled. Thus, the ALJ accepted that her scoring methodology indicated the higher the number she circled the greater she believed B.G.'s limitations to be. Said another way, although her numbers were inflated, they correlated logically with B.G.'s limitations but with a lesser value.

Under SSR 06-03p, an ALJ must consider all the evidence, including opinions from other sources, such as educators. SSR 06-3p, 2006 WL 2329939, at *4. As explained above, in assessing such opinions, the ALJ may apply the factors in 20 C.F.R. § 416.927(d)(1)-(6). Id. With respect to Ms. Schauman's opinions regarding the number values she assigned to the form, the ALJ relied on her lack of consistency when he found that the specific degrees of limitations indicated on the form were inconsistent with other evidence of record. See 20 C.F.R. § 416.927(d)(4). Therefore, the Court concludes that the ALJ properly "followed" SSR 06-03p. Furthermore, the Court notes that the record supports the ALJ's observation that B.G.'s reported physical activities were inconsistent with Ms. Schauman's numerical values assigned to B.G.'s degrees of limitations. See (R. at 308-09) (Mom's testimony that B.G. swims); (R. at 312) (B.G.'s testimony that he runs and plays gymnastic games, baseball, soccer, T-ball, and basketball). In light of the fact that the ALJ properly applied SSR 06-03p, reasonably analyzed Ms. Schauman's opinions, and, with the exception of the particular numbers

circled on the teacher questionnaire indicating levels of limitations, granted them "great weight," the Court finds no error.

### f. The ALJ Properly Considered Opinions from School Psychologist, Dr. Hayden Hartmann

Plaintiff also argues that the ALJ did not apply SSR 06-03p in analyzing Dr. Hayden Hartmann's opinions. Plaintiff's Brief, pp. 21-22. Defendant argues that the ALJ properly evaluated Dr. Hartmann's opinions. Defendant's Brief, p. 17.

Dr. Hartmann examined B.G. on several occasions, administering standardized tests and evaluating B.G. for his IEPs (R. at 125-28, 213-17). Although Dr. Hartmann did not offer any diagnoses, her reports offer extensive descriptions of B.G.'s functioning (R. at 125-28, 213-17). The ALJ did not acknowledge Dr. Hartmann's reports as distinct from any other school assessments. Instead, the ALJ summarily gave "great weight to the opinion[s] of the examining psychologists, occupational therapists, and speech and language therapists who have evaluated the claimant over the past several years" (R. at 22, 24).

Unlike the ALJ's analysis of Mr. Tatikoff's and Ms. Schauman's opinions, here the ALJ did not discuss any of the factors described in SSR 06-03p or describe how he considered Dr. Hartmann's opinions. SSR 06-03p explains that "[a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that . . . subsequent reviewer[s] [can] follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL

2329939, at *6. In this case, because it is clear that the ALJ at least referred to Dr.

Hartmann's reports, the Court declines to find error. See Baldwin v. Astrue, 2009 WL

4931363, at *26 (S.D.N.Y. Dec. 21, 2009) (finding error where the ALJ failed to even

refer to the opinions of two school psychologists). Nonetheless, in light of the ALJ's

failure to consider all the evidence relevant and probative to B.G.'s learning, on remand

the ALJ should revisit Dr. Hartmann's reports.

### g.  ALJ did not Err in Failing to Call a Medical Expert

Plaintiff argues that the ALJ erred in failing to call a medical expert. Plaintiff's

Brief, p. 26. Defendant argues that the ALJ did not err because calling a medical expert

is at the ALJ's discretion. Defendant's Brief, p. 24.

The regulations explain that an ALJ "may also ask for and consider opinions from

medical experts on the nature and severity of your impairment(s) and on whether your

impairment(s) equals the requirements of any [Listing]." 20 C.F.R. § 416.927(f)(2)(iii). As

the Defendant noted, the regulations leave calling a medical expert to the discretion of

the ALJ. Id.; see Carter v. Comm'r of Soc. Sec., 2008 WL 1995122, at *5 (W.D.N.Y.

May 6, 2008) ("As the court's plain reading of this regulation suggests, and as the cases

have confirmed, this language is 'permissive, not mandatory.'"). Based upon the

language of the regulation, the Court cannot find that the ALJ erred in failing to call a

medical expert.

It is also possible that Plaintiff was relying upon Social Security Ruling 96-6p

("SSR 96-6p") to argue that an "updated medical opinion" was required from a medical

expert. Plaintiff's Brief, p. 26. The relevant portions of SSR 96-6p explain that

"longstanding policy requires" an ALJ to receive into the record as expert opinion

evidence, the judgment of a State agency physician or psychologist on the issue of whether a claimant's impairments are equivalent to a listed impairment. SSR 96-6p, 1996 WL 374180, at *3 (S.S.A.). This requirement is met in the present case by the opinions of non-examining State agency physician, Dr. Bostic and non-examining State agency psychologist, Dr. Guenther (R. at 158-63). See SSR 96-6p, 1996 WL 374180, at *3 (explaining that the requirement is met by the ALJ receiving into the record one of various documents signed by medical consultants evaluating equivalence). SSR 96-6p further explains that an ALJ must obtain an "updated medical opinion from a medical expert" when either (1) no additional evidence is received but the ALJ believes the record suggests equivalence, or (2) additional evidence is received "that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding." Id. at *4. The Court notes that in either condition, obtaining an updated opinion from a medical expert depends upon the ALJ reaching the opinion that the claimant's impairments could be equivalent to a listing. Thus, even if Plaintiff was relying on SSR 96-6p, the Court must conclude that seeking additional evidence from a medical expert was within the discretion of the ALJ and the Court can find no error in the ALJ's exercise of that discretion in this case.

### h. The Court Declines to Remand for Taking Additional Evidence

Plaintiff argues that the Court should remand the case to the Commissioner to consider additional evidence submitted to this Court. Plaintiff's Motion Brief, pp. 2-3; Plaintiff's Reply Brief, pp. 6-7. Defendant argues that the evidence submitted to the

Court does not provide a basis for remanding under the Act. Defendant's Brief, pp. 25-26.

The Act provides that a Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has summarized this three-pronged requirement as follows:

> An appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative, [such that there is] . . . a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently [and the] . . . claimant must show (3) good cause for her failure to present the evidence earlier.

Lisa v. Sec'y of Dept. of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991) (internal citations omitted).

Plaintiff's proffered new evidence consists of a neuropsychological examination conducted by psychologist, Charles Zaroff, Ph.D., a specialist to whom B.G. was referred by his neurologist, Dr. Higgins. Plaintiff's Motion, Dkt. No. 14, Appendix 1, pp. 1-10 (hereinafter "Zaroff Report"). The Court finds that Dr. Zaroff's 2008 report is not "new" because he performed substantially the same tests that B.G. had taken at various times in 2004 and 2006 and he repeated diagnoses found elsewhere in the record. See DiBlasi v. Comm'r of Soc. Sec., 660 F.Supp.2d 401, 407 (N.D.N.Y. 2009) (finding evidence cumulative and not new because it reiterated diagnoses and functional limitations already documented in the record). A review of Dr. Zaroff's report shows that

he administered a battery of tests, most of which B.G. had taken on previous occasions. Compare Zaroff Report, p. 4 with (R. at 117-18, 121-24, 205-07, 214-15, 276-82, 284-85). Additionally, Dr. Zaroff diagnosed Plaintiff with a learning disorder not otherwise specified and pervasive developmental disorder not otherwise specified. Zaroff Report, p. 8. However, these diagnoses were already rendered by consultative psychologist Dr. Brett Hartman who diagnosed B.G. with a learning disorder not otherwise specified (R. at 154) and psychiatric nurse practitioner, Hani Khalil, who diagnosed B.G. with pervasive developmental disorder or childhood disintegrative disorder (R. at 294). Based on the foregoing, the Court declines to remand this case under sentence six of 42 U.S.C. Section 405(g) because the evidence proffered is not new within the meaning of the Act. Nonetheless, on remand, Plaintiff may be able to properly submit updated medical evidence to the Commissioner.

### i. The Argument Raised in Plaintiff's Reply Brief for the First Time is Waived

In a Reply Brief, Plaintiff argued for the first time that the ALJ was obliged to, but failed, to get treatment notes and a medical source statement from "Dr. Green." Plaintiff's Reply Brief, p. 5. Defendant argues that this argument is waived because it was not raised in Plaintiff's opening brief. Defendant's Sur-reply Brief, p. 5.

The Court agrees with Defendant and declines to reach this issue because Plaintiff failed to raise it in the opening brief. Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (considering an argument waived where Plaintiff raised it in a reply brief but failed to argue it in his opening brief). Nonetheless, for the benefit of the parties, the Court notes that the record indicates that Dr. Roger Green was one of B.G.'s

pediatricians at Pine Street Pediatrics, and that the group's treatment notes[10] are already part of the record (R. at 100-107, 137, 164-73, 257). Furthermore, the Court notes that the Commissioner will have to develop the record as necessary on remand.

### IV.    Conclusion

After carefully examining the administrative record, the Court finds the Commissioner's decision is not supported by substantial evidence and not determined in accordance with the applicable law. In particular, the Court notes that standardized tests in the domain of acquiring and using information indicate B.G. had greater limitations than found by the ALJ, but the ALJ did not address this critical area of evidence or explain why it was rejected.

Based on the foregoing, it is respectfully recommended that the Commissioner's decision denying disability benefits be REMANDED for further proceedings in accordance with this recommendation and pursuant to sentence four of 42 U.S.C. Section 405(g). However, the Court DENIES Plaintiff's motion to remand pursuant to sentence six of 42 U.S.C. Section 405(g).

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge


DATED: May 27, 2010
Syracuse, New York

---

[10] The treatment notes from Pine Street Pediatrics also contain a blank medical source statement form that B.G.'s pediatricians apparently declined to complete (R. at 100-101).

**Orders**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

**SO ORDERED**.

Victor E. Bianchini
United States Magistrate Judge

DATED: May 27, 2010

Syracuse, New York

36